This case is 4-14-0850 PBEI Holdings, LLC v. First National Bank. And appearing for the appellant is Natalie Lorenz, and for the appellee is Michael Murphy. Ms. Lorenz, you may proceed. Good morning, Your Honors. My name is Natalie Lorenz, and I am the attorney for First National Bank of Dieterich on this appeal. So this appeal is from summary judgment in a foreclosure case, and the issue is the priority of the parties' respective security interests. Today I'm going to explain why the doctrines of both conventional and equitable subrogation do not allow PBEI, with its fourth recorded mortgage, to take priority over FNB Dieterich's third recorded mortgage. First, for conventional subrogation, PBEI argues time and time again that its fourth recorded mortgage has priority because PBEI refinanced FNB Dieterich's first recorded mortgage. PBEI based this argument solely on the fact that it did that refinancing. The problem is there are actually four requirements under Illinois law for conventional subrogation to apply. The fact that a refinancing occurred is just one of those four elements. And those four elements are, first, that there is an express agreement with the debtor that the subsequent lender is to have the rights of the previous lender. Second requirement is, of course, that a refinancing occurred, and FNB Dieterich does not contest that that element is met here. The third requirement is that no harm will come to an innocent party. And the fourth requirement is that there has been no gross negligence. I'm going to concentrate mostly on the first and fourth elements as I go forward. But all four of them are required in order for conventional subrogation to apply. So the first element is the express agreement. And this is the Ames and Union Planners cases where the court held that the subsequent lender and the debtor had come to an express agreement that subrogation was to occur because the mortgages provided three things. There was no magic language saying, yes, we're going to step into the shoes of the first lender. But there were three things that indicated that intent on the part of the parties. One, that no subordinate liens were to remain open at the closing. Two, the lender could pay off any liens that had priority. And three, that additional amount would become part of additional debt secured by that mortgage. So the court held that that language in both of those cases, in the mortgages at issue, showed that the debtor and the subsequent lender intended that the subsequent lender was to be able to assert the rights of previous lenders. So PBEI attempts to argue that the law does not really require an express agreement that the subsequent lender is to gain priority. The argument is that it just requires there's an agreement to the effect that a refinancing is to take place. If that is the case, then there would be no need for this element of an express agreement. There's already an element of refinancing is to take place. That doesn't make sense why there would be this express agreement element. And that's not what the case law provides. The case law specifically states that the parties need to have intended that the subsequent lender step into the prior lender's shoes. It's not permitted to be inferred? I'm sorry? It's not permitted to be inferred? No, it can be inferred, but there needs to be an agreement showing that somewhere. And in this case, there is no language showing that the parties intended that the subsequent lender, PBEI, or its predecessor, was to step into the shoes of FNB Dietrich. Well, PBEI, doesn't PBEI indicate that the express agreement here is the refinancing agreement? Right, that is their argument, that the refinancing agreement is the express agreement. But that agreement doesn't contain the language or language similar to the language you were referring to in the other cases? Correct. And in fact, it provides language that there are still going to be other loans out there, and that the debtor, in this case Lakeland, is supposed to continue paying off these other loans, rather than PBEI being able to pay off those loans and add that amount to the amount that is indebted to them. So it is actually, and in Ames, the case that PBEI continuously cites throughout its case, Ames actually distinguishes itself from another case with language just like this one, where prior liens were remaining open and the debtor in that case was, I'm sorry, the lender, subsequent lender in that case was distinguishing itself from the prior case. So, and PBEI also argues that under Ames you can't agree to priority, that it is determined by law. First, that statement in Ames is dicta. Second, conventional subrogation, also known as contractual subrogation, i.e. subrogation by agreement, is the law that we're dealing with in this case. Many other cases that we will be discussing today show that there is a requirement of an express agreement for contractual subrogation to apply, and actually Ames did as well. As I said, that statement was dicta. Earlier in the case, as I said before, Ames contrasted itself with a previous case where there was no express agreement. So, as I said before, the language in Ames and in Union Planners is exactly the opposite of the language of PBEI's mortgage in this case. It provides in a section entitled Prior Security Interest that the mortgagor is to make all payments on those loans when due. And Ames and Union Planners both demonstrate that the express agreement requirement is not that there was an express agreement for refinancing, but there was an express agreement that the subsequent lender would step into the shoes of the prior lender. In your reply brief, you begin by pointing out that PBEI argues for the first time that both the doctrine of conventional subrogation and the doctrine of equitable subrogation apply. And you assert that because this is the first time PBEI has raised the issue of equitable subrogation, that it has forfeited that issue and is not properly before this court. You cite State Ex Rel Positere, but that's a rather different situation, is it not? That I think isn't the normal rule one that says if you're the appellant seeking to reverse, you can't argue to reverse the trial court based on an issue not raised there. But if you're the appellee, you can argue for anything shown on the record as reason to affirm the trial court, including matters that maybe the trial court either omitted or ruled on incorrectly. Your Honor, in this case there were actually cross motions for summary judgment. And so the position of the appellant is that whenever the appellee had its motion for summary judgment before the trial court, it had the opportunity to make the argument for equitable subrogation at that level and did not do so. So what? They're the appellee. If the record shows that summary judgment is properly granted based upon a matter that is clear on the record, why can't we affirm? We're reviewing judgments, not reasons. Why can't we affirm for any judgment supported by the record or for any reason supported by the record, even if it's one that the court didn't cite, the parties didn't cite at the trial level, but they're citing now. And, Your Honor, I'm not going to spend too much time arguing against that. I do believe that on the merits of the equitable subrogation, the appellee does not meet all the requirements under that law either. But, you know, I don't want to. Well, that's a different issue, whether or not the record is sufficient to show it. But the Pusateri case, for instance, I think was an administrative review matter. And I think the law is pretty clear that we can address it no matter what. As long as if the record is not sufficient, then by not raising it below, they have forfeited their opportunity. But if the record is sufficient, we can address it. Well, I just wanted to address that since that's the very first thing you raised in your brief, and I don't think it's a correct statement of the law in your reply brief. Go ahead. All right. So going back for a moment to conventional subrogation, the first element, as we discussed before, was the express agreement. The second element, again, is the loan proceeds were used to refinance. And F&B Dietrich admits that that element is met in this case. Moving on to the third element, that no substantial harm will come to an innocent party, F&B Dietrich had two loans in this case. It had the first priority loan for $750,000. There was another loan for about $400,000. And then it had a third loan for about $242,000, if I remember correctly. So the third loan that it had was behind over a million dollars in debts. Being in third place and being in first and third place are two different things, and that is why this case is distinguishable from union planers as far as this element goes. The Bank of Redwood would never have loaned that extra $242,000 if it didn't have the first place position already. And applying conventional subrogation in this case would allow PBEI to pick and choose which superior liens it wants to pay off. Moving on then to the gross negligence element, the fourth element. This element centers on whether the subsequent lender had notice of a third party's lien but failed to establish priority over it. Constructive notice meaning the lien was recorded, but the subsequent lender didn't find it. This combined with the failure to establish priority has not resulted in gross negligence findings in the past. That would be the union planner's case. However, when a subsequent lender has had actual notice but does nothing to gain priority, not even equitable subrogation is available. The subsequent lender would have no expectation, that is, discharging prior liens. And Premier in this case, which is PBEI's predecessor, had actual knowledge. It had title work done, there's email correspondence from PBEI's file that indicates that there was a plan to begin with to pay off both of these Bank of Red Buds liens, which is the predecessor to F&B Dietrich. Premier changed that plan at the last second and failed to obtain a subordination agreement. So at a minimum, Premier was grossly negligent in this case, and actually it acted with knowledge and intent when it chose not to pay off both of those liens. How are we to define gross negligence here in the context of conventional subrogation? There's actually in the Bierstadt case, which is the very first case where conventional subrogation is mentioned, or at least the first case that either of the parties was able to cite, which suggests that actual knowledge coupled with the failure to obtain priority would bar relief. Here's a quote from that case. It says, the failure of Appalee or her agent to learn of appellant's trust deed was not negligence, which would bar her right to relief when the only notice was constructive and not actual. I think that tells you what the court was getting into whenever it said there needs to be no gross negligence. There needs to be no actual notice and failure to obtain priority. And I'll read the quote again. The failure of Appalee or her agent to learn of appellant's trust deed was not negligence, which would bar her right to relief when the only notice is constructive and not actual. They actually made that distinction in that case. And I think that gives a big clue as to what they were talking about whenever they were talking about gross negligence. And in union planners, you see that again. The court noted that some form of negligence had been committed because the title insurer in that case didn't locate a prior recorded lien. And that caused the refinancing lender to fail to obtain priority over that prior recorded lien. So the court had to decide whether the title insurer's negligence was imputable to the refinancing lender, and if so, whether that negligence was gross in nature. So the trial court ultimately held that it was not imputable, so there was no need to address whether there was gross negligence or not. So given that case, constructive knowledge, again, would not be gross negligence. But again, with the hint from the Bierstadt case, there's the and not actual language at the end of that quote, implying that whenever they're talking about gross negligence, if you've got actual knowledge combined with the failure to obtain priority, that would be gross negligence. So let's see. Going through those elements again, you've got the express agreement, you've got the refinancing, and then the third element, and then finally the third element being, or the fourth element, I'm sorry, that there is no gross negligence. So Premier asserts that it was not negligent when it failed to gain priority through a subordination agreement or loaning enough money to pay off both the loans, because the law was clear that conventional subrogation applied. And this is somewhat of a circular argument. An element for conventional subrogation is met because it was clear that conventional subrogation applied. And beyond that, the argument is a little bit suspect, because internal documents from Premier or from PBEI showed that there was a note that F&B Dietrich's lien was superior and that there was an issue due to the lack of the subordination agreement and that they were going to be working with an attorney so that they could work on a claim of subrogation. So the claim that they knew that conventional subrogation would apply is highly suspect, given these internal documents. Moving on then to equitable subrogation, even if PBEI did not waive that argument, it nonetheless fails on the merits. There are actually very few cases that discuss the requirements for equitable subrogation to apply. Those that do discuss it suggest that the expectations of the parties is the central inquiry. So you've got Detroit Steel Products as one of the cases cited by PBEI for the proposition that the court should not look to technical niceties. So in that case, there were competing liens of a bank, which thought it had paid off all of the applicable mechanics liens. And then there were claimants for some subsequent mechanics liens. The subsequent mechanics liens arose after the bank's lien, but there was a contract provision saying that they were supposed to have statutory priority and it did in fact give them statutory priority. But the court held that the bank's expectation was that it was discharging all of those prior liens. If you contrast that case with the Phylactos case that I cited in my brief, the court held that there must be some evidence that the parties seeking equitable subrogation intended to take first priority. So in the Phylactos case, you had Harris Bank filing a complaint alleging that the debtors breached some covenants in a subdivision. The debtors later granted two other banks mortgages on their property. Then Harris Bank filed a Liz Pendens notice. MERS then paid off the two other banks' mortgages and Harris Bank subsequently obtained a judgment. Because of the Liz Pendens notice, Harris Bank was entitled to priority over MERS. MERS tried to argue that equitable subrogation applied. Unlike in Detroit Steel Products, though, in which the bank had demanded that those prior mechanics liens had been paid off, there was no evidence that MERS had attempted to gain priority over Harris Bank, even knowing that that Liz Pendens notice was out there. It had actual knowledge of the Liz Pendens notice. And here we have the same thing. There was actual knowledge of the prior lien of F&B Dietrich, the third recorded mortgage, and there was no attempt at all made to gain priority over that mortgage. And this bank, PPEI, knew how to do that. It had obtained a subordination agreement from the Nolmans, and it didn't do that with the third recorded mortgage. And presumably that was because the original plan was to pay off both the first and third recorded mortgage according to its internal documents, but at the last minute, for whatever reason, it changed its mind and it failed to obtain that subordination agreement, unlike what it did with the Nolmans. And for that reason, it failed to obtain priority, and now it's seeking to obtain priority through this doctrine of conventional subrogation in order to fix its mistake. And the doctrine of conventional subrogation just simply does not apply to fix a mistake in that manner whenever there was gross negligence, actual knowledge, plus failure to obtain priority. And for those reasons, Your Honor, I would ask that you reverse the trial court on this matter. Thank you, Ms. Lorenz. Mr. Murphy? Good morning, Your Honors. May it please the Court, counsel. I'm Michael Murphy on behalf of the plaintiff in this case, PBEI Holdings, LLC. We're asking that you affirm the ruling of the trial court finding that PBEI's lien has priority over the First National Bank of Detroit's lien in this mortgage foreclosure action. There are two separate but related bases on which this Court can affirm. One is conventional subrogation and one is equitable subrogation. As Justice Steidman noted, we did not forfeit the issue of equitable subrogation. The trial court did rely on that in its ruling, but equitable subrogation was actually alleged in the complaint in the case from the outset. Can I ask for clarification there? You said the trial court relied on that doctrine. Conventional subrogation. Conventional? Yes. Well, I was looking at the transcript of proceedings for the May 23rd hearing relative to the motions for partial summary judgment, and then there is the judgment of foreclosure that was entered by the trial court in August. At the conclusion of the May 23rd hearing, the trial court said that it was taking the matter under advisement, and then there is the August 28th judgment in which the trial court indicates that it's finding in your client's favor on the issue of priority. And I just see that it uses the word subrogation as opposed to either conventional or equitable subrogation. Two parts to this question. Was there any explanation by the trial court as to its decision either in a ruling from the bench or in a separate letter memorandum, or is this all that we have? And then secondly, is there anything within that judgment of foreclosure that identifies it as equitable subrogation that the court relied on? Your Honor, the circuit court subsequent to the hearing on summary judgment entered a very brief order, and it simply stated the doctrine of conventional subrogation applies to the facts of this case and the plaintiff is entitled to be segregated to the priority position held by the Bank of Redbud as for first mortgagee up to the amount owned by the Bank of Redbud on June 19, 2007. So that was the order on the summary judgment motions. That's at the record C-292-91. That was not an appealable order, though, Your Honor, so we thereafter had to get an order entered actually ruling on the foreclosure, and I believe thereafter even had to get a 304 finding in order to appeal that issue. So the trial court did not issue any reasoning behind why it thought conventional subrogation applied. It heard the arguments, the transcript is in the record, and then the court issued that brief order, and then there were subsequent orders that allowed us to appeal. In the foreclosure order, I don't believe there was any specification as to whether it was conventional or equitable subrogation. If we prepared that order, Your Honor, I would imagine we just said subrogation because we did plead both of those doctrines as a basis for relief. But as I was saying, that issue was not forfeit at all, and as Justice Steigman noted, this court can affirm on any basis in the record, so if equitable subrogation also applies, then that's another basis for affirming the decision of the trial court. Both of these are exceptions to the first-in-time, first-in-right rule, and that rule doesn't always apply, and our positions at the trial court properly apply these exceptions in this case. First, as to conventional subrogation, that doctrine arose from a very old Supreme Court case, 1897 case, Home Savings Bank v. Bierstadt. The 5th District and union planners tried to break down that ruling into four separate elements, and we've used those elements in our briefs that are generally accurate, but I'm going to refer back to the genesis of that doctrine in discussing those elements, particularly the express agreement requirement. The Supreme Court said in Bierstadt, conventional subrogation results from an equitable right springing from an express agreement with the debtor, by which one advances money to pay a claim for the security of which there exists a lien, and by such agreement he is to have an equal lien to that paid off. Then he is entitled to the benefit of the security which he has satisfied, with the expectation of receiving an equal lien. So, really the express agreement requirement is that there is a written agreement that someone is paying off the debt of another and expects to be paid back by that person. Well, counsel, what was the purpose of getting the agreement with the Nolmans, but not doing it with respect to the amount owed that we're here on today? Your Honor, I can't answer what the reasoning of that was. That is what happened. I don't know why they didn't get another agreement with the Bank of Bread, but I would say that... They didn't have to get that agreement with the Nolmans? That's your position today, that if they hadn't, it would still be okay? They would still have priority? Correct. Correct, Your Honor. But we don't believe there's a requirement. There is also not a requirement to request the Bank of Redbud to enter into this agreement. They would always have the right to refuse that agreement, so it's not gross negligence to not offer that agreement when there's no guarantee that it would ever be accepted anyway. And as to the express agreement requirement, really that's just an express agreement that's documented to show, as the Supreme Court discussed, that the money was not a gift and was not given in the form of a volunteer. It's an express written agreement showing that this agreement's payoff instead of another was made. And so here we do have that express agreement. That's the refinance agreement. So why have the requirement for conventional subrogation that you have an express agreement and then a second requirement for refinancing? It sounds like you're conflating those two. Well, the express agreement requirement is just that. It's an actual written agreement. In 1897, the Supreme Court says we need to have an express written agreement to show that someone actually did pay off this debt for another person so that they are then entitled to this lien. Otherwise, there would be no documentation that they didn't just give them the money as a gift to pay off the lien of another person and no way to prove that the person actually should be entitled to that priority position. And how would you define a refinancing? Well, the refinancing simply, in this case, is that written agreement that meets that first requirement. I'm not going to suggest that anything here is intuitive, at least from my own perspective. I'm not sure that I totally understand the doctrines involved, but it's my understanding that your opponent would suggest, taken to its logical conclusion, your argument would lead to the conclusion that every refinancing agreement is the equivalent of conventional subrogation. Perhaps not every refinancing agreement, Your Honor, but the court in Ames Capital held that the law of the state is that a refinancing mortgagee that records its mortgage lien is entitled to be subrogated to the original lien and its corresponding priority position established by the original mortgagee under the doctrine of conventional subrogation up to the amount that the original mortgage secured at the time of its perfection. The doctrine of conventional subrogation will apply if the original mortgage lien is in full force in effect at the time that the refinancing mortgage lien is recorded. That's exactly what we have in this case. The original mortgage lien of Red Bank was still in effect at the time that the refinancing mortgage lien was recorded, and then later the original mortgage lien was released by the Bank of Red Bank. Based on that holding, that's exactly the situation we have here. So the refinancing mortgagee is entitled to priority position under the doctrine of conventional subrogation under that holding. Therefore, the refinance agreement is the express agreement in this case that entitles us to the conventional subrogation. There was some discussion of language in that agreement that suggested that we did not think we would be in a priority position such that acknowledging that there could be other security interests out there and requiring them to make payments under those security interests. Our position is that acknowledging those interests is completely... it makes sense in a refinancing situation because there certainly could be other security interests between the time of the original mortgage and the time of the refinance, and to say that you would like the mortgagee to continue to make those payments makes sense because you wouldn't want them to default on those other loans as well and possible default foreclosure under those loans as well. And that was the case when Bank of Red Blood was the original mortgage holder because it was the second and then its own third. It would expect that the mortgagee would pay both the first and third under those circumstances. And we do rely on the statement in Ames that it says, even if there were an additional person that specifically stated that the refinancer would have a first priority lien, it would be of little effect as lien priority is determined by law in the agreement of the parties notwithstanding. The second element has been admitted, the proceeds were used to pay off the original loan The third element is where we have some discussion as far as whether any harm will come to an innocent party by granting priority to PBEI. The alleged innocent party here is the Bank of Red Blood, the First National Bank of Detroit now. The party who had no knowledge of the superior liens would be that innocent party, someone who in the interim wasn't aware of the refinancing agreement and would then be harmed by the subrogation being applied. While consistent with the purposes of the recording statutes, which is to provide notice of liens to third parties, F&B Dietrich's predecessor had actual knowledge of the liens at all times during these proceedings. It actually noticed when it recorded its third mortgage that its lien would be third in priority behind $1,150,000 of total liens, its own first lien, and then the Nolman's, and then its third. And of course, they had actual notice of refinancing because they received a check to pay off the balance of that loan. Our position is they're not harmed at all by the application of subrogation. They're actually in the same position or even a better position as the result of the refinancing. Before the refinancing, they were owed money on their first mortgage, they knew of the second mortgage, and then they had their third mortgage. As a result of the refinancing, they received payment in full satisfaction of their first mortgage. TBI stepped into their shoes. And then their third mortgage was still third in line between two other mortgages. They're in the exact same position as they were, behind $1,150,000 of total liens. So they're actually in a better position also because they received a lump sum satisfaction of their entire first mortgage. And if you look at the numbers, they first loaned Lakeland $750,000, and they were paid in full for that loan when PBEI refinanced and took over that position. They later loaned Lakeland $242,000 and secured that loan with title to mobile homes on the property. The court documents show that they later received $178,000 towards payment of that third loan and is now only owed $63,000 on that third mortgage. PBEI, on the other hand, loaned Lakeland $750,000 for the refinance and is still owed $630,000 on that loan. If Diedrich is found to have priority over PBEI, they will have recovered their entire first mortgage, which PBEI paid for and took over. And then will be first in line to recover their third mortgage as well when it's already been reimbursed for over two-thirds of the amount of their third mortgage. So they're not in any worse position. And actually, we believe they're receiving a windfall if subrogation is not applied in this case. But PBEI, in its shoes, when it is the one who paid off its loan to begin with. The requirement of gross negligence. I didn't believe there was a lot of discussion at Beerstadt about what the definition of gross negligence is. Counsel cited a quote from that case. That was actually the Supreme Court quoting an even earlier case. And that case actually had to do with equitable subrogation. But I defined it in my brief from another case as utter indifference to duty or the right to vote. That was a personal injury case from 1897? Yes, Your Honor. There wasn't much discussion either in Beerstadt or in subsequent cases about subrogation, about what that actually meant, gross negligence. But again, we don't believe it's gross negligence to not seek an agreement with someone or party. There's no requirement to do that. Especially when there's no guarantee that the agreement will be accepted. And again, they were fully aware that we were paying off their loan completely for the purpose of refinancing that loan. Again, lien priority is determined as a matter of law. So that agreement is not necessarily required in order for subrogation to apply. And as a matter of law, they were stepping into the shoes of the Bank of Redmond. I read the quote earlier from the Ames capital case. We hold this is the law of Illinois that if you refinance, then under these circumstances, conventional subrogation will apply. So we don't think there's anything that could be considered gross negligence. The other allegation is they're picking and choosing which liens they're going to pay off. Well, we didn't pick and choose. They specifically identified which lien they were going to pay off. It says, we're refinancing this mortgage, the Bank of Redmond's first mortgage on the property. There's no requirement either that they were to loan the debtor enough money to pay off every loan that was outstanding out there when they refinanced the first one. So they didn't pick and choose which liens to pay. They just refinanced the first mortgage. They didn't act in utter indifference to the rights of the Bank of Redmond or First National Bank of Detroit. In fact, they acknowledged their rights. They gave them their money. They paid off their loan in its entirety, and they released that loan. Again, everyone had actual knowledge of all the liens at any given time, so we don't think there's anything that could constitute gross negligence here on the part of PBEI. As to the issue of equitable subrogation, as already noted, the trial court based it on conventional subrogation, but this court can affirm on any basis. It is in the record. We pled it in the complaint. We argued it at summary judgment. We filed a motion to supplement the record to show that. It was argued, in fact, by both sides at the summary judgment hearing. There was no forfeiture there. The law is sparse on this subject, but in general it says, application does not depend on any set of circumstances, but depends on the equities of each individual case, and it's designed to prevent unjust enrichment. This court in the Detroit Steel Products case said, equity does not look to the technical niceties of proceedings, but is concerned with the ultimate consequences. To permit the bank to stand in the shoes of the claimants to the extent they receive loan proceeds takes nothing from the other claimants to which they were otherwise entitled. And looking at the circumstances here, I recited them earlier as far as where the money went with all these transactions and what's still outstanding. Dietrich would be unjustly enriched at PBEI's expense if PBEI is not subrogated to the first priority position. Application of equitable subrogation takes nothing away from FME Dietrich to which they were otherwise entitled. They're left in the same exact position they would be in through segregation in favor of PBEI. They knew when they gave their third mortgage that it was subject to two other mortgages, and it's still subject to two other mortgages. They would receive a windfall and would be unjustly enriched if PBEI is not segregated to the first priority position. FME Dietrich already had its entire first lien satisfied, and now seeks to subordinate PBEI's lien, which was created for the express purpose of satisfying FME Dietrich's lien in favor of their own third lien. They want the court to ignore the ultimate consequences that I discussed earlier of the refinancing transaction so that it can unjustly obtain the entire amount of its first mortgage that was paid by PBEI and fully recover on its third mortgage as well, made with full knowledge of the existence of the first mortgage, before PBEI recovers anything at all. We don't believe equity should allow this or does allow this, and equitable subrogation should apply as well, such that PBEI has the first priority. So the court can affirm the circuit court's ruling that PBEI's lien has priority over FME Dietrich's under either conventional subrogation or equitable subrogation. If there's no other questions, we just ask that you affirm the ruling of the trial court that PBEI's lien has priority. Thank you, Mr. Murphy. Ms. Larkins. Thank you, Your Honors. Just to address some things very quickly here, moving to the express agreement requirement, opposing counsel has cited the Ames case as the proposition for saying that there is no actual need for an express agreement that one party will stand up and step into the shoes of another party. It's just an express agreement that a refinancing is to take place. And as Your Honor noted, that is actually conflating two of the elements here. There would be no need for the second element, which is that a refinancing is to take place if it was somehow also part of this first element that there is an express agreement. What the cases say is that the agreement between the debtor and the lender must be to the effect that the lender would advance sufficient funds to pay the prior deeds of trust, and here's the second part, and then would receive from the debtor a first mortgage as security for the funds advanced. That is what the Ames case actually says. And I believe that opposing counsel's argument sort of ignores the second part of that language where it says that would receive from the debtor a first mortgage. I believe that that language shows that it's not necessarily just that there's an agreement that a refinancing happened. That's what the second element is for. The first element is that there's an express agreement that someone's going to be stepping into the shoes of another person. And again, in the Ames case, the facts are completely contrasted here from what happened in that case. And in the Ames case itself, it contrasted with, I believe it's called first mark standard. In Ames, the court held that in contrast to other cases in which the refinancing mortgage expressly stated that it was subject to prior liens, the three provisions I discussed earlier where there was no subordinate liens to remain open, the lender could pay off any other liens, and the additional amount would become debt secured by the mortgage. That was what the Ames court held was the express agreement, even though it wasn't expressly saying that somebody was going to step into the shoes of another. That was the intent of those three provisions in that language. Let's see. Another element that I wanted to discuss was the gross negligence element, which is in the Bierstadt case. That case, again, does indicate that the failure of the lender to learn of the prior mortgage, the intervening mortgage, cannot be negligence. And that negligence occurs when there is actual rather than constructive notice combined with the failure to obtain priority. Let's see. Moving on to equitable subrogation, PBEI argues that F&B Dietrich would be unjustly enriched if equitable subrogation is not applied since it knew of the first recorded mortgage. There is no unjust enrichment here. Again, Premier was supposed to be paying off both of these loans all along, and then at the last second changed his mind for whatever reason and then failed to get that subordination agreement. He's now trying to fix that mistake by using this conventional subrogation. Furthermore, PBEI argues that F&B Dietrich's knowledge of its own first mortgage should prevent it from keeping equitable or conventional subrogation from applying. In Phylactos, the party opposing equitable subrogation, which was Harris Bank, knew of prior liens as well, but the court still held that equitable subrogation would not apply despite that knowledge. They were in the exact same position Harris Bank was that F&B Dietrich is, and equitable subrogation still did not apply. So it just seems that knowledge on the part of the person opposing equitable subrogation is not relevant. It's the knowledge of the person who is trying to apply equitable subrogation that is relevant. Unless you have any questions, I would just ask that this Court reverse the trial court on this matter. Thank you, Counsel. The case will be taken under advisement and a written disposition shall issue.